# EXHIBIT 2

17-3147-cv

Div. 1181 A.T.U.—N.Y. Emps. Pension Fund et al. v. City of N.Y. Dep't of Educ. et al.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2018

(Argued: August 20, 2018      Decided: December 10, 2018 )

Docket No. 17-3147-cv

——————————————————

DIVISION 1181 A.T.U.—NEW YORK EMPLOYEES PENSION FUND, BY ITS
TRUSTEES MICHAEL CORDIELLO AND STANLEY BRETTSCHNEIDER,
BOARD OF TRUSTEES,

*Plaintiffs–Counter-Defendants–Counter-Claimants–Appellants*,

MICHAEL CORDIELLO, ITS TRUSTEES, STANLEY BRETTSCHNEIDER,

*Plaintiffs–Counter-Defendants*,

v.

CITY OF NEW YORK DEPARTMENT OF EDUCATION,

*Defendant–Counter-Claimant–Appellee*,

JEAN CLAUDE CALIXTE, THOMAS JEMMOTT, JAMES HEDGE, NEIL
STRAHL, DOMENIC GATTO, ANDREW BRETTSCHNEIDER,

*Counter-Defendants*.

——————————————————

1   Before:

3   　　　　　HALL and LOHIER, *Circuit Judges*, and RESTANI, *Judge*.[*]

5   　　　　　Division 1181 A.T.U.—New York Employees Pension Fund and its trustees
6   (collectively, "the Fund") appeal from a judgment of the United States District
7   Court for the Southern District of New York (Castel, <u>J.</u>), dismissing its claims
8   against the New York City Department of Education (the "DOE") for delinquent
9   withdrawal liability payments under the Multiemployer Pension Plan
10  Agreements Act ("MPPAA"), 29 U.S.C. § 1381 <u>et seq.</u>  The Fund argued that the
11  DOE was the "employer" of the Fund's participants under the MPPAA and that
12  it is therefore subject to the withdrawal liability incurred by some of its private
13  contractors upon their withdrawal from the Fund.  The District Court held that
14  the DOE had no "obligation to contribute" to the Fund that would render it an
15  employer for the purposes of the MPPAA.  We **AFFIRM**.

17  　　　　　　　　　　　　　　　　　JEFFREY S. SWYERS (Richard S. Siegel, *on the*
18  　　　　　　　　　　　　　　　　　*brief*), Slevin & Hart, P.C., Washington,
19  　　　　　　　　　　　　　　　　　D.C., *for Plaintiffs–Counter-Defendants–*
20  　　　　　　　　　　　　　　　　　*Counter-Claimants–Appellants*.

22  　　　　　　　　　　　　　　　　　MELISSA D. HILL, Morgan, Lewis & Bockius
23  　　　　　　　　　　　　　　　　　LLP, New York, NY (Jeremy P. Blumenfeld,
24  　　　　　　　　　　　　　　　　　Morgan, Lewis & Bockius LLP,
25  　　　　　　　　　　　　　　　　　Philadelphia, PA, *on the brief*), *for*
26  　　　　　　　　　　　　　　　　　*Defendant–Counter-Claimant–Appellee*.

28  LOHIER, *Circuit Judge*:

29  　　　　　Division 1181 A.T.U.—New York Employees Pension Fund and its trustees

30  (collectively, "the Fund") appeal from a judgment of the United States District

31  Court for the Southern District of New York (Castel, <u>J.</u>), dismissing the Fund's

---

[*] Judge Jane A. Restani, of the United States Court of International Trade, sitting by designation.

1    claims against the New York City Department of Education (the "DOE") for

2    delinquent withdrawal liability payments under the Multiemployer Pension Plan

3    Agreements Act ("MPPAA"), 29 U.S.C. § 1381 <u>et seq.</u>  The Fund argued that the

4    DOE was the "employer" of the Fund's participants under the MPPAA and is

5    therefore subject to the withdrawal liability incurred by some of its private

6    contractors upon their withdrawal from the Fund.  The District Court held that

7    the DOE had no obligation to contribute to the Fund and was therefore not an

8    employer under the MPPAA.  We **AFFIRM**.

9                                     **BACKGROUND**

10        1.  <u>Facts</u>

11        The DOE operates the public schools in the City School District of the City

12    of New York.  For decades, it has contracted with private companies, including

13    Hoyt Transportation, DAK Transportation, Canal Escorts, and the Logan Bus

14    Company (collectively, the "Contractors"), to provide transportation services for

15    students who attend school in the district.  Each of the Contractors was, at all

16    relevant times, party to a collective bargaining agreement ("CBA") with the

17    Amalgamated Transit Union Local 1181-1061, AFL-CIO (the "Union").  The

1    CBAs required the Contractors to make monthly contributions to the Fund, a

2    multiemployer pension plan, on behalf of covered employees.

3          Under the terms of the transportation contracts, the DOE assigned bus

4    routes to each Contractor and required each Contractor to display a DOE route

5    number on its buses, to make available its financial and maintenance records to

6    the DOE, and to report all bus accidents to the DOE.  The contracts also

7    addressed certain management issues.  While generally prohibiting DOE officers

8    and employees from serving on the board of any Contractor (unless the officer or

9    employee was "not involved in the Contractor's business with the City," App'x

10   325), the contracts required each Contractor to report any change in management

11   to the DOE and to obtain DOE approval for changes in ownership greater than

12   five percent.

13         The contracts also covered the Contractors' employees.  As relevant to this

14   appeal, those employees fell within two main categories: drivers and escorts.

15   Drivers were responsible for driving buses along the routes assigned by the

16   DOE, while escorts were responsible for "generally supervis[ing] and aid[ing]"

17   disabled students on their trips to and from school.  N.Y.C. Admin. Code § 19-

18   603(a).  Under the contracts, both drivers and escorts had to be certified by the

4

1    DOE to perform contract work and were subject to DOE inspections while on

2    duty.  If a driver or escort failed an inspection, the DOE could suspend or revoke

3    that employee's certification.

4         In 1979 the DOE announced that it planned to accept new bids for

5    transportation contracts that did not provide drivers with certain wages and

6    benefits.  In response, the Contractors' drivers went on strike.  To end the strike,

7    the DOE and the Union negotiated a written agreement known as the "Mollen

8    Agreement."  As part of the Mollen Agreement, the DOE agreed to insert

9    Employee Protection Provisions ("EPPs") into all of its transportation contracts,

10   including those with the Contractors.  The EPPs required each Contractor (1) to

11   contribute to the Fund on behalf of participating employees in amounts

12   determined by either its DOE contract or its CBA with the Union, and (2) to

13   certify annually that it owed no outstanding contributions.  If a Contractor failed

14   to contribute to the Fund, the DOE could "withhold the appropriate amounts

15   from any payments due to the [C]ontractor and pay them" to the Fund on behalf

16   of affected employees or, if the failure was willful, cancel the contract.  App'x

17   303.  If a contract expired or was canceled by the DOE, the Contractor would

1 "remain liable for any outstanding pension . . . contributions still due and

2 owing." App'x 304.

3       The EPPs themselves did not materially distinguish between driver and

4 escort employees. But the contracts contained a separate Cost Reimbursement

5 provision that applied to escorts alone. Under that provision, a Contractor could

6 elect to receive "full reimbursement" from the DOE for certain expenses incurred

7 "in connection with the employment, training[,] and qualification of escorts,"

8 including those itemized in an attached "Schedule of Special Education Escort

9 Costs." App'x 129. That Schedule, in turn, included the Contractor's "share of

10 pension paid" to the Fund "as per [the Division] 1181 union contract." App'x

11 189.

12       Until 2012, even though the term of the Mollen Agreement had expired,

13 the DOE voluntarily continued to extend the contracts containing the EPPs. In

14 2012 the DOE started to issue bids for new transportation contracts that did not

15 include any EPPs. The Contractors, who were bound by their CBAs to contribute

16 on behalf of their covered employees, lost their contracts to other companies that

17 were not so bound and therefore able to bid at lower prices. Having lost their

18 only source of revenue, at least some of the Contractors filed for bankruptcy.

1    2. <u>Procedural History</u>

2         In 2013 the Fund's trustees determined that the Contractors had effected a

3    "complete withdrawal" from the Fund, triggering "withdrawal liability" under

4    the MPPAA.  <u>See</u> 29 U.S.C. § 1381(a).  The Fund pursued its withdrawal liability

5    claims against some of the Contractors in bankruptcy court, but the Contractors

6    lacked sufficient assets to cover the entirety of their alleged withdrawal liability.

7         The Fund then commenced this action, alleging that the DOE was an

8    "employer" of the Fund's participants and therefore jointly and severally liable

9    for the Contractors' withdrawal liability.  The Fund's complaint identified four

10   theories of liability: (1) the transportation contracts obligated the DOE to

11   contribute to the Fund, (2) the DOE and the Contractors were a "single

12   employer," (3) the Contractors were alter egos of DOE, and (4) the DOE and the

13   Contractors were "joint employers."

14        The DOE moved to dismiss the Fund's complaint for failure to state a

15   claim.  The District Court granted the motion in part, holding that the DOE had

16   not signed any contract obligating it to contribute to the Fund.  It also held that

17   the Fund had not plausibly alleged that the DOE and the Contractors were a

18   single employer, such that the DOE would be bound by the CBAs signed by the

1   Contractors.  But the District Court denied the motion to dismiss as to the Fund's

2   joint employer and alter ego claims.  The DOE moved for reconsideration of the

3   District Court's refusal to dismiss those two claims.  The District Court granted

4   that motion as to the Fund's claim that the DOE and the Contractors were joint

5   employers.  It observed that an "employer" under the MPPAA is any entity with

6   an "obligation to contribute" to a pension plan, and that the MPPAA defines

7   "obligation to contribute" to include both contractual obligations and obligations

8   under "applicable labor-management relations law," which includes the

9   National Labor Relations Act ("NLRA").  Sp. App'x 20–21 (quoting 29 U.S.C.

10  § 1392(a)).  Explaining that it had overlooked a provision in the NLRA excluding

11  "any State or political subdivision thereof" from the definition of "employer," Sp.

12  App'x 21 (quoting 29 U.S.C. § 152(2)), the District Court held that the DOE, a

13  political subdivision of the State, cannot have an obligation to contribute arising

14  from "a duty under" the NLRA (the only labor-management relations statute to

15  which the parties pointed the District Court) that would subject it to withdrawal

16  liability under the MPPAA.  29 U.S.C. § 1392(a)(2).

17          After discovery limited to the Fund's alter ego claim, the DOE moved for

18  summary judgment.  The District Court granted the motion, reasoning that no

8

1    reasonable jury could conclude, based on the evidence proffered by the Fund,

2    that the Contractors were the corporate alter egos of the DOE.  Having

3    determined that the Contractors were not alter egos of the DOE, the District

4    Court concluded that the Fund had failed to show "that the DOE was effectively

5    a signatory to the CBA and therefore subject to withdrawal liability."  Sp. App'x

6    42.

7        The Fund timely appealed.

8                              **DISCUSSION**

9        We review the District Court's decisions <u>de novo</u>, viewing the allegations

10   in the dismissed complaint and the evidence marshaled by both parties on

11   summary judgment in the light most favorable to the Fund.  <u>See</u> <u>Apotex Inc. v.</u>

12   <u>Acorda Therapeutics, Inc.</u>, 823 F.3d 51, 59 (2d Cir. 2016); <u>Robinson v. Concentra</u>

13   <u>Health Servs., Inc.</u>, 781 F.3d 42, 44 (2d Cir. 2015).

14       The Fund brings its claims against the DOE under 29 U.S.C. § 1381(a),

15   which provides: "If an employer withdraws from a multiemployer plan . . . , then

16   the employer is liable to the plan in the amount determined under this part to be

                                     9

1   the withdrawal liability."[1]  Only an "employer," therefore, is exposed to

2   withdrawal liability under the MPPAA.

3       The MPPAA does not define "employer."  In the absence of a statutory

4   definition, we have construed the term as "a person who is <u>obligated to</u>

5   <u>contribute</u> to a plan either as a direct employer or in the interest of an employer

6   of the plan's participants."  <u>Korea Shipping Corp. v. N.Y. Shipping Ass'n-Int'l</u>

7   <u>Longshoremen's Ass'n Pension Tr. Fund</u>, 880 F.2d 1531, 1537 (2d Cir. 1989)

8   (emphasis added) (quotation marks omitted).  The MPPAA, in turn, refers to "an

9   obligation to contribute arising—(1) under one or more collective bargaining (or

10  related) agreements, or (2) as a result of a duty under applicable labor-

11  management relations law."  29 U.S.C. § 1392(a).  The parties agree on appeal

12  that <u>Korea Shipping</u> incorporated the MPPAA's statutory definition of

13  "obligation to contribute," which includes both contractual and legal obligations.

14  <u>See</u> <u>Laborers Health & Welfare Tr. Fund v. Advanced Lightweight Concrete Co.,</u>

---

[1] "The purpose of withdrawal liability is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers."  <u>HOP Energy, L.L.C. v. Local 553 Pension Fund</u>, 678 F.3d 158, 161 n.2 (2d Cir. 2012) (quotation marks omitted).

1    484 U.S. 539, 545–46 (1988).  We therefore evaluate the Fund's claims using the

2    framework established by 29 U.S.C. § 1392(a).

3        1.  Obligation Under CBAs or Related Agreements

4        We first consider the Fund's argument under 29 U.S.C. § 1392(a)(1) that the

5    DOE had an obligation to contribute to the Fund arising "under one or more

6    collective bargaining (or related) agreements" involving the Contractors' drivers

7    and escort employees.

8        A.  Terms of the Contracts

9        As an initial matter, the Fund acknowledges that the DOE was not a

10   signatory to the CBAs.  For that reason, the District Court held that the CBAs

11   themselves could not obligate the DOE to contribute.  The Fund nonetheless

12   argues that it would "elevate[] form over substance" to hold that the DOE lacked

13   an obligation to contribute arising under the CBAs where the Contractors

14   entered into the CBAs only "because they were obligated to do so by their

15   Contracts with DOE."  Appellants' Br. 21, 23.

16       We agree that an entity can, under certain limited circumstances, be bound

17   by (and therefore be obligated to contribute under) a CBA it did not sign.  See,

18   e.g., Bowers v. Transportacion Maritima Mexicana, S.A., 901 F.2d 258, 262 (2d

11

1    Cir. 1990) (where defendant was bound as a member of the New York Shipping

2    Association ("NYSA") "by the agreements negotiated [o]n its behalf" by the

3    NYSA, it was "an employer subject to withdrawal liability").  But the Fund has

4    failed to explain how the Contractors' CBAs here bind or create any obligations

5    enforceable against the DOE, a non-signatory.  Even if the Contractors entered

6    into the CBAs due to their contracts with the DOE, the Union could have

7    enforced the CBAs' contribution provisions against only the Contractors.  We

8    therefore conclude that the DOE had no obligation to contribute arising under

9    the Contractors' CBAs.

10        The Fund next argues that the DOE had an obligation to contribute arising

11   under its individual agreements with each of the Contractors.[2]  Although the

12   contracts place the obligation to contribute squarely on the Contractors, not the

13   DOE, the Fund contends that the contracts created a pass-through obligation to

14   contribute and that the Contractors were just conduits for contribution payments

---

[2] In addressing this argument, we conclude as a threshold matter that the contracts between the DOE and the Contractors are "related" to the CBAs within the meaning of 29 U.S.C. § 1392(a)(1).  The CBAs expressly refer to provisions in the transportation contracts, which in turn contemplate that the Contractors will make contributions to the Fund in amounts determined by their CBAs.  See Carriers Container Council, Inc. v. Mobile S.S. Ass'n—Int'l Longshoreman's Ass'n, 896 F.2d 1330, 1344 & n.24 (11th Cir. 1990).

1   that originated with the DOE.  We are not persuaded.  We held in <u>Korea</u>

2   <u>Shipping</u> that two shipping carriers were "employers" under the MPPAA, and

3   therefore subject to withdrawal liability, where they had signed a CBA obligating

4   them to make payments to the NYSA, which in turn would transmit those

5   payments to a pension fund.  880 F.2d at 1535, 1539.  Because "[t]he contributions

6   were received directly from the carriers under the [CBA] for the express purpose

7   of funding the . . . pension plan," we concluded that the NYSA was "merely [a]

8   conduit[] for monies which the carriers were obligated to pay into the . . . pension

9   fund," and that permitting the carriers to avoid liability would "effectively

10  undermine" the purposes of the MPPAA.  <u>Id.</u> at 1539–40.  Here, by contrast, the

11  Fund does not allege that the DOE was bound by any agreement that required it

12  to contribute, directly or through an intermediary, to the Fund.  This ends our

13  analysis for the Contractors' drivers.

14       The contractual landscape diverges slightly for escort employees, requiring

15  us to further analyze the claims involving them.  As noted, the contracts

16  contained a Cost Reimbursement provision that required the DOE, upon a

17  Contractor's election, to reimburse the Contractor for pension contributions it

18  made on behalf of its escort employees.  The Fund contends that this provision

13

1    imposed on the DOE an "indirect" obligation to contribute, at least on behalf of

2    the escorts who participated in the pension plan.  We have not yet determined

3    whether an entity that assumes a contractual obligation to reimburse an

4    employer for the pension-related costs of its employees thereby assumes an

5    obligation to contribute under the MPPAA.  The Seventh Circuit, which

6    considered the issue in the context of a declaratory judgment action, established

7    a general rule that "the obligation to <u>reimburse</u> for contributions made by

8    another is not the equivalent of an obligation to <u>contribute</u> in the first instance."

9    <u>Transpersonnel, Inc. v. Roadway Express, Inc.</u>, 422 F.3d 456, 461 (7th Cir. 2005);

10    <u>id.</u> at 462 & n.4 (distinguishing <u>Korea Shipping</u> and rejecting the plaintiff's

11    argument that Transpersonnel was "merely a conduit through which pension

12    plan payments passed . . . to the fund" (quotation marks omitted)).  The court

13    explained that the distinction between reimbursement and contribution is

14    "important for purposes of [the] definition of 'employer' under the MPPAA":

15        By its terms, th[e] obligation of reimbursement does not arise until
16        <u>after</u> a contribution has been made, and extends only to amounts
17        actually contributed.   If Transpersonnel made pension fund
18        contributions that were too small, or omitted contributions, the
19        pension fund could not look to Roadway for the balance as Roadway
20        was only contractually obligated to reimburse Transpersonnel for the
21        actual amounts Transpersonnel contributed.  Roadway would have
22        no obligation to make up the difference because it was not

14

1    contractually obligated to contribute to the pension fund in the first
2    place.

3    Id. at 461.  We agree with the Seventh Circuit that reimbursement and

4    contribution are distinct concepts under the MPPAA.  The Fund, like the pension

5    plan in Transpersonnel, could not have "look[ed] to" the DOE under the escort

6    cost reimbursement provision to cover any shortfall in the Contractors'

7    contributions.[3]  Id.  Had the parties intended to place such an obligation to

8    contribute on the DOE, they could have clearly laid out that obligation in the

9    transportation contracts.  To be sure, differences exist between the

10   reimbursement provision in Transpersonnel and the reimbursement provision in

11   this case.  Under the provision here, for example, the DOE advanced escort costs

12   based on an initial estimate by the Contractor and, if the actual costs incurred

13   were less than the estimated amount, the DOE would deduct the difference from

14   the next monthly payment due to the Contractor.  But we do not think these

15   differences exempt this case from the general rule announced in Transpersonnel.[4]

---

[3] At most, the Fund could have requested, under a different provision of the contracts,
that the DOE attach delinquent payments owed by a Contractor to the Fund.  The Fund
does not suggest that this attachment procedure "is [the] DOE's obligation to
contribute."  Appellants' Br. 9 n.4.

[4] There may be cases in which a plaintiff seeking to recover withdrawal liability
payments plausibly alleges that the defendant used reimbursement as a subterfuge to
avoid accepting a contractual obligation to contribute.  We do not foreclose the

15

1    We therefore hold that the DOE had no obligation to contribute arising

2    under its transportation contracts, even on behalf of escort employees.

3         B.  <u>Single Employer Status</u>

4    Although we conclude that the CBAs and transportation contracts did not,

5    by their terms, obligate the DOE to contribute to the Fund, that does not end our

6    analysis under 29 U.S.C. § 1392(a)(1).  Because a finding of "single employer"

7    status would bind the DOE to the CBAs signed by the Contractors, we consider

8    whether the Fund adequately alleged that the DOE and each of the Contractors

9    were a single employer.

10    A CBA that binds one entity also binds a non-signatory entity if (1) the two

11    entities are a "single employer" and (2) the employees of the entities "constitute a

12    single appropriate bargaining unit."  <u>Brown v. Sandimo Materials</u>, 250 F.3d 120,

13    128 n.2 (2d Cir. 2001).  Ultimately, single employer status is "characterized by

14    [the] absence of an arms[-]length relationship found among unintegrated"

15    entities.  <u>Id.</u> (quotation marks omitted).  To determine whether two entities are a

16    single employer, we review several non-dispositive factors: "interrelation of

17    operations, common management, centralized control of labor relations[,] and

possibility that such allegations, if proven, could render the reimbursing entity an "employer" under the MPPAA.  This is not such a case.

16

1   common ownership." Lihli Fashions Corp. v. NLRB, 80 F.3d 743, 747 (2d Cir.

2   1996) (per curiam) (quotation marks omitted).  The entities' "use of common

3   office facilities and equipment and family connections" are also relevant.  Id.

4           Turning to the allegations in this case, we conclude that the Fund did not

5   adequately plead that the DOE and each of the Contractors were a single

6   employer.  The Fund concedes that the DOE and the Contractors were not

7   commonly owned, and it made no argument based on centralized control of

8   labor relations.  As to the interrelation-of-operations factor, the Fund points to

9   allegations that the DOE determined the routes assigned to each Contractor and

10  dictated maintenance and cleaning requirements for the buses, and the complaint

11  alleges, furthermore, that the DOE required each Contractor to maintain a

12  "website connection" with the DOE.  We agree with the District Court, however,

13  that these allegations are equally consistent with an arm's-length contractual

14  relationship.  As to the common management factor, the Fund cites contractual

15  provisions prohibiting the Contractors from replacing their Chief Executive

16  Officers or effecting a significant change in ownership without DOE approval.

17  But these contractual provisions, typical in commercial contracts, do not

18  plausibly suggest that the DOE and the Contractors had a common management

17

1    structure, especially where, as here, the contracts also contained an express

2    conflict-of-interest clause that prohibited DOE officers and employees from

3    serving on the board of any Contractor.

4          Accepting, as we must, all of the Fund's nonconclusory allegations as true,

5    we conclude that it has not pleaded DOE involvement to a degree that would

6    suggest that the DOE and the Contractors were "a single integrated enterprise."[5]

7    Lihli Fashions, 80 F.3d at 747 (quotation marks omitted).  We therefore agree

8    with the District Court that the DOE is not bound by the Contractors' CBAs as a

9    single employer.

10          C.  Alter Ego Status

11          As noted, the Fund's last argument under 29 U.S.C. § 1392(a)(1) is that the

12   Contractors were alter egos of the DOE.  Alter ego status "provides an[other]

13   analytical hook to bind a non-signatory to a [CBA]."  Truck Drivers Local Union

14   No. 807 v. Reg'l Imp. & Exp. Trucking Co., 944 F.2d 1037, 1046 (2d Cir. 1991); see

15   Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Custom Air Sys., Inc., 357

16   F.3d 266, 268 (2d Cir. 2004) (per curiam).  The alter ego doctrine, like the single

---

[5] The Fund complains that the District Court did not specifically analyze the "common equipment" factor when evaluating its single employer claim.  But the Fund does not point to any allegations about shared equipment that would alter our conclusion.

18

1    employer doctrine, involves a flexible test that considers whether "two

2    enterprises have substantially identical management, business purpose[s],

3    operation[s], equipment, customers, supervision, and ownership." Ret. Plan of

4    UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S., 629 F.3d 282, 288 (2d

5    Cir. 2010) (quotation marks omitted). "The focus of the alter ego doctrine . . . is

6    on the existence of a disguised continuance or an attempt to avoid the obligations

7    of a [CBA] through a sham transaction or technical change in operations." Lihli

8    Fashions, 80 F.3d at 748 (quotation marks omitted). "[A]nti-union animus or an

9    intent to evade union obligations" is "germane" to the analysis, but not

10   necessary. UNITE HERE, 629 F.3d at 288 (quotation marks omitted).

11        The District Court did not err in its evaluation of the alter ego factors. It is

12   undisputed that the Contractors managed their own budgeting and finances,

13   made their own salary decisions, retained legal and accounting firms of their

14   own choosing, and elected officers who were unaffiliated with the DOE. It is also

15   undisputed that the Contractors operated out of their own offices and had sole

16   ownership of (or leasing rights to) the buses they used to perform contract work.

17   The Fund failed to proffer any evidence that the DOE and the Contractors were

18   commonly owned or that the DOE harbored anti-union animus. Although the

19

1    Fund adduced evidence that the DOE extensively monitored the Contractors'

2    compliance with the contracts and that Contractor managers felt obligated to

3    meet the DOE's demands, that evidence, viewed in context, shows little more

4    than the existence of a long-term vendor-vendee relationship in a highly

5    regulated commercial setting.  We see nothing in the record supporting the

6    conclusion that the Contractors were "disguised continuance[s]" of the DOE or

7    that the DOE's transportation contracts were "sham transaction[s]" designed to

8    avoid obligations under the CBAs.  Lihli Fashions, 80 F.3d at 748 (quotation

9    marks omitted).  We therefore hold that the District Court properly granted

10    summary judgment in favor of the DOE on the Fund's alter ego claim.[6]

11        Because the Fund has not shown that the DOE signed or was otherwise

12    bound by any contract obligating it to make contributions, we affirm the District

---

[6] We reject the Fund's argument that the District Court should have denied the DOE's motion for summary judgment "because the alter ego test inherently requires weighing evidence and drawing inferences" and is therefore "inappropriate for resolution on summary judgment."  Appellants' Br. 48–50.  We routinely affirm grants of summary judgment where there is no genuine dispute of material fact, even where the applicable law is a flexible, multifactor test.  See Wang v. Hearst Corp., 877 F.3d 69, 75–76, 75 n.2 (2d Cir. 2017); see also N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 650 (2d Cir. 2005) (affirming a grant of summary judgment on an alter ego claim).

1    Court's orders to the extent they conclude that the DOE had no obligation to

2    contribute under 29 U.S.C. § 1392(a)(1).

3         2.   Obligation Under Applicable Labor-Management Relations Law

4         We now turn to the Fund's argument under 29 U.S.C. § 1392(a)(2).  The

5    Fund contends that, even if the DOE had no obligation to contribute arising

6    under the CBAs or its transportation contracts, it nonetheless had such an

7    obligation arising under an "applicable labor-management relations law."  In

8    advancing this argument, the Fund relies on the common law joint employer

9    doctrine.  That doctrine imposes liability for violations of labor or employment

10   laws not only on the nominal employer but also on entities that, although legally

11   separate from the nominal employer, "handle certain aspects of the[] employer-

12   employee relationship jointly."  Arculeo v. On-Site Sales & Mktg., LLC, 425 F.3d

13   193, 198 (2d Cir. 2005) (quotation marks omitted) (Title VII); see Barfield v.

14   N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 141, 149 (2d Cir. 2008) (FLSA).

15        In urging a contrary conclusion, the DOE argues that the phrase

16   "applicable labor-management relations law" in 29 U.S.C. § 1392(a)(2) refers only

17   to the NLRA and the Labor Management Relations Act ("LMRA").  Because

18   those statutes exempt government entities from liability, it argues, neither statute

1  obligates the DOE to contribute under 29 U.S.C. § 1392(a)(2).  The DOE's initial

2  premise is flawed.  Although the Supreme Court appears to have equated "labor-

3  management relations law" at least with the NLRA, see Laborers Health, 484 U.S.

4  at 545–46, it has never held that the phrase is limited to the NLRA or LMRA, see

5  Bd. of Trs. of IBT Local 863 Pension Fund v. C & S Wholesale Grocers, Inc., 802

6  F.3d 534, 544 n.13 (3d Cir. 2015); see also Bay Area Laundry & Dry Cleaning

7  Pension Tr. Fund v. Ferbar Corp. of Calif., 522 U.S. 192, 196 n.1 (1997) ("An

8  'obligation to contribute' arises from either a collective-bargaining agreement or

9  more general labor-law prescriptions." (emphasis added)).  The DOE

10  acknowledged as much during oral argument.  Oral Arg. Tr. at 15.

11      But even assuming that "labor-management relations law" includes more

12  than the NLRA and LMRA, the Fund's argument fails.  Under 29 U.S.C.

13  § 1392(a)(2), an obligation to contribute must arise "as a result of a duty under

14  applicable labor-management relations law."  The Fund has not persuasively

15  explained how the joint employer doctrine, untethered to any particular statute

16  beside the MPPAA,[7] creates such a "duty."

---

[7] To the extent the Fund ties the joint employer doctrine to the NLRA, we agree with the District Court that the DOE is exempt from the NLRA as a government entity and therefore cannot have an obligation to contribute arising from a duty under the NLRA. See 29 U.S.C. § 152(2).

1   Because the joint employer doctrine does not independently create a duty

2  to contribute under 29 U.S.C. § 1392(a)(2), we affirm the District Court's

3  dismissal of the Fund's joint employer claim.

4             CONCLUSION

5   We have considered the Fund's remaining arguments and conclude that

6  they are without merit.  For the foregoing reasons, the judgment of the District

7  Court is **AFFIRMED**.